# UNITED STATES DISTRICT COURT

## District of Kansas

(Topeka Docket)

UNITED STATES OF AMERICA,

        Plaintiff,

v.                          CASE NO. 5:22-cr-40055-TC-RES

ROGER GOLUBSKI,

        Defendant.

## GOVERNMENT'S MEMORANDUM AND PROFFER IN SUPPORT OF ITS MOTION FOR PRETRIAL DETENTION

The United States of America, by and through undersigned counsel, respectfully moves this Court to issue an Order detaining Defendant Roger Golubski pending trial, pursuant to 18 U.S.C. §§ 3142(a)(4), 3142(f)(1)(A) and (B), and 3142(g). The defendant, a former detective with the Kansas City, Kansas, Police Department, has been indicted on six federal felony charges involving abuse of his authority and sexual violence in violation of 18 U.S.C. § 242. Three of the counts charge the defendant with sexually assaulting a then-13- to 14-year-old girl. The defendant faces a potential sentence of life in prison for each of the six counts.

Detention is necessary because clear and convincing evidence establishes that no condition or combination of conditions will reasonably assure the safety of other people or the community.  The government therefore seeks to detain the defendant pending trial.

## I.    **BACKGROUND**

On September 14, 2022, a federal grand jury returned an indictment under seal charging the defendant with six counts of violating 18 U.S.C. § 242 by sexually assaulting two victims—one of whom was a minor—while acting under color of law.  All six counts charge that the defendant's conduct included aggravated sexual abuse and an attempt to commit aggravated sexual abuse, and five of the counts charge that the defendant's conduct included kidnapping and an attempt to commit kidnapping.  The six charged counts are all crimes of violence, permitting the government to seek detention under 18 U.S.C. § 3142(f)(1)(A), and they are all punishable by up to life imprisonment, permitting the government to seek detention under 18 U.S.C. § 3142(f)(1)(B).

On September 15, 2022, after the indictment was unsealed and when the defendant was arraigned, the government moved that the defendant be detained.[1]  There is no condition or combination of conditions to reasonably assure the safety of other people or the community, and therefore this Court can and should continue to detain the defendant pending trial.

---

[1] The government noted in response to a query from the Court during arraignment that it may argue at the detention hearing that it moves for detention in part under Section 3142(f)(2)(B).  The government does not rely on that provision, however; the government seeks to detain the defendant under Sections 3142(f)(1)(A) (crime of violence) and 3142(f)(1)(B) (maximum sentence of life imprisonment).

II.    **FACTUAL PROFFER OF THE EVIDENCE SUPPORTING THE CHARGES**

At a detention hearing, the government may present evidence by way of a proffer. 18 U.S.C. § 3142(f); *United States v. Lewis*, 769 F. Supp. 1189, 1193 (D. Kan. 1991). The government therefore proffers the following evidence set forth below and throughout this memorandum.

A.   **S.K. (Counts One-Three)**

When she was a 13- or 14-year-old middle school student in or around 1998, S.K. received a call from a blocked number on her cell phone; the call was from the defendant, whom she had never met. The defendant introduced himself as a police officer and told S.K. that he was calling because she was a potential witness to a crime. Implying that he was helping her out, the defendant said that they should meet somewhere away from the police department, because he did not want people to see her there and think that she was a snitch. S.K. did not have any idea what it was that she was supposed to have witnessed, but she agreed to meet the defendant.

S.K. met the defendant in a parking lot, where he was waiting in his vehicle. The defendant showed S.K. his badge, identified himself as a police officer, and carried a firearm that was visible in his hip holster. S.K. got into the sedan, the defendant locked the doors, and he drove approximately 15 feet into an alley where they were out of view. The defendant began the conversation by telling S.K. how attractive and sexy she was, and he said, "I bet you taste as good as you smell." Nervous and confused, S.K. asked him what they needed to talk about, and the defendant responded with irritation, telling her that

3

they would get to that, and asking her why she was so worried if she didn't have anything to do with what happened.  (The defendant never did speak with S.K. about the incident he said that S.K. had witnessed, nor did he identify the incident to which he referred.)

The defendant asked S.K., who is Black, about her background and family, and S.K. got the impression that he already knew who her mother and/or grandmother was.  S.K. spoke about her deep gratitude to her grandmother, who took in S.K. to live with her. Eventually, the defendant asked her, "Do you have Caucasian in you?  Do you want some?" S.K.—who was 13 or 14 years old and a virgin—did not understand what he meant and started crying.  The defendant slapped her, warned her against starting "that crybaby shit," and told her that she was old enough to make decisions.  The defendant offered S.K. money for oral sex; S.K. said no.  He offered her a pill, which S.K. also declined.  Then, the defendant asked S.K. how much she cared about her grandmother; in particular, he asked her if she loved her grandmother enough to "jump my dick," or if she wanted to end up missing her grandmother.  The defendant put his hand on S.K.'s thigh.

At that point, S.K. felt like she was in a life or death situation; she feared for her own life because the defendant had a gun and she was scared that he would shoot her, and she feared for her grandmother's life because S.K. believed that the defendant would follow through on his threats.  S.K. slouched down in the passenger seat, and the defendant began to put his hand down her shorts.  S.K. reached out her arm to stop him, and the defendant told her "don't you dare."  The defendant inserted his fingers into S.K.'s vagina, then put his fingers in his mouth and told her how good she tasted.  The defendant masturbated with one hand while inserting his fingers into her vagina with the other hand.  At one point, S.K.

4

felt the defendant's knuckle pop inside of her, and she was afraid.  When he asked her if she wanted to "taste it," S.K. said no, backed up, and hit her head on the car window.  The defendant ejaculated onto S.K.'s shirt.

After he ejaculated, the defendant instructed S.K. to pull her pants down, turn around on all fours, and show him her anus.  The defendant inserted a finger in her anus; S.K. told the defendant how much it hurt, and he told her to shut up and that she liked it. The defendant put some sort of lubricant from his glovebox on his fingers and inserted his finger in S.K.'s anus while masturbating himself.  When he could not get an erection, the defendant seemed frustrated and told S.K. to turn around.  The defendant instructed her to put her mouth on his penis.  S.K., who had never given oral sex before, just sat there, and the defendant told her to hurry up.  Crying, S.K. put her mouth on his penis.  She accidentally scraped him with her teeth; the defendant grabbed her hair so hard that she felt her neck pop and told her that she had better "learn how to suck dick."

The defendant warned S.K. that she had to keep her mouth shut or she could "kiss [her] sweet little grandmother goodbye," and that he ran the streets so "don't fuck with" him.  After this first sexual assault, S.K. felt pain in her vagina and anus, her vagina was swollen, and it hurt to urinate and bathe.

The following week or so, S.K. received another blocked-number phone call from the defendant, who instructed her to meet him in another parking lot.  S.K. once again got into the defendant's vehicle.  She wanted to ask the defendant "why me," but the defendant was impatient and seemed to be in a hurry.  He scooted his seat back, pulled his pants to mid-thigh, and instructed her to get on top of him.  S.K. thought about trying to shoot the

defendant with his firearm, but she had never used one before and was afraid that she wouldn't use it correctly and he would shoot her.  The defendant's penis was not hard, and he put his mouth on her breast until it was.  Then the defendant put his penis inside of S.K.'s vagina and raped her, which felt dry and painful, and he made her say, "I love you, Papi."  The defendant ejaculated inside of S.K.'s vagina.  When S.K. tried to climb off of him, the defendant made her wait with his penis inside of her for a few minutes, and she felt humiliated.  When the defendant finally allowed S.K., who had been a virgin, to move, there was blood on the defendant's penis.  The defendant punched S.K. in the face for not telling him that she was on her "cycle," and she tried to explain that she was not.  The defendant once again threatened S.K.'s grandmother and warned S.K. to keep her "fucking trap" shut.  After the defendant drove away, S.K. knelt on the ground, tried to push his semen out of her, and dry-heaved.  In the days after, S.K.'s vagina was sore and she experienced vaginal blood spotting.

The defendant sexually assaulted S.K. more than 10 times over the course of the next approximately 3 years.  Each time, the defendant made a blocked-number call to S.K.'s cell phone and arranged a time and place for their meeting.  Each time, he had his firearm, and each time S.K. feared that he would kill her and/or her grandmother if she did not submit.  In between the assaults, S.K. would see the defendant sitting in his vehicle outside of her middle school, her high school, and her grandmother's house.  Sometimes the defendant would call her, not to arrange a meeting, but to "keep tabs" on her.

During the assaults, the defendant used physical violence.  He slapped S.K. in the face—on one occasion, "for looking so sexy for Papi today"; he punched S.K. in the face;

he used his thumbs under S.K.'s chin to choke her on multiple occasions; and he once struck S.K. with his firearm.  S.K.'s childhood friend recalls S.K. exhibiting a drastic change in behavior around this time—going from bubbly and bright to downcast and silent—and seeing S.K. with injuries.

The defendant also used threats, which S.K. took seriously because she could tell by his demeanor and by his power in the community that the defendant meant them.  He continued to threaten S.K.'s grandmother; he threatened to leave S.K.'s brains on the dashboard; he once pointed his firearm at S.K.'s feet and told her "bitch I can make you dance"; and he would tell S.K. that he ran the streets, talking to her about a man named Mark who was killed and noting that Mark had threatened the defendant "and then look what happened."  On one occasion, the defendant took S.K. to a cemetery, made her get out of the vehicle, and instructed her to find an area to dig her own grave.

Threats regarding the river were among the most severe and impactful for S.K.  The defendant repeatedly took S.K. to an area by the river, and he would sing a childhood song to her: the original lyrics were "down by the river said a hank a pank, where the bullfrogs jump from bank to bank," but the defendant's version was "down by the river said a hank a pank, where they won't find her until she stank."  At the river, the defendant put a dog leash around S.K.'s neck, made her get on all fours, and made her crawl alongside him as he walked.  The defendant consistently threatened S.K., reminding her of the consequences to her grandmother's life and to her life if she did not do what he said, and specifying that she would end up in the river with the fishes and no one would find her.

### B.  <u>O.W.</u> (Counts Four-Six)

O.W., who is Black, first met the defendant in August 1999, when KCKPD served a search warrant on her house and arrested her teenaged sons.  The defendant was wearing plain clothes with a firearm visible in his hip holster.  He introduced himself as a detective and remained with O.W. while the other officers searched the house.  The defendant complimented O.W.'s legs and told her he liked her nightgown.

The defendant returned some days later, reintroduced himself as a detective, and told her that he could help her sons.  The defendant, whose firearm was visible, put his hand on her leg, and O.W. slapped it away.  The defendant repeated that he could really help her sons, replaced his hand on her leg, and pushed it up under her skirt.  O.W. asked the defendant what he was doing and stood up.  The defendant stood up as well, and unzipped his pants.

The defendant grabbed O.W. by the wrists, put her hands over her head, and pushed her onto the couch.  The defendant continued to hold O.W.'s hands over her head and inserted his penis into her vagina.  O.W. tried to get up.  She told the defendant, "This is rape."  The defendant held O.W. in place and responded "you'll like it" and "it'll only take a minute."  After he raped her, the defendant got paper towels and wiped himself off.  He warned O.W. not to say anything or he would hurt her or have someone else hurt her.

The defendant returned to O.W.'s house periodically for the next 2-3 years.  He vaginally raped her 3-4 times; on the occasions after that, he demanded oral sex.  When he demanded oral sex, the defendant would grab the back of O.W.'s head, force her mouth down on his penis, and hold her there to the point where she would feel like she was

choking.  On one occasion, the defendant made her get into his vehicle, grabbed her by the head, and forced her to give him oral sex inside the vehicle.

O.W. felt like she had no choice but to submit to the defendant when he would show up because the defendant was a detective who was supposed to be looking out for her sons (he consistently told her that he could help them, that he knew people, and that he often got drinks with the prosecutor); because the defendant had a gun and she was afraid that he would shoot her; and because she was afraid that the defendant knew people in prison and could have her sons hurt.  One time, O.W. threatened to tell someone what the defendant was doing to her; the defendant told her that if she did, he would have someone do something to her, and she would never be found.

## III.   LEGAL ANALYSIS

A grand jury found probable cause that the defendant committed the crimes charged in the indictment.  The six charged counts are all crimes of violence, permitting the government to seek detention under 18 U.S.C. § 3142(f)(1)(A), and they are all punishable by up to life imprisonment, permitting the government to seek detention under 18 U.S.C. § 3142(f)(1)(B).

An analysis of the factors to be considered under 18 U.S.C. § 3142(g) reveals that there is clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  18 U.S.C. § 3142(f).  Accordingly, the defendant should be detained pending trial.

A. <u>**The Nature and Circumstances of the Offense Charged**</u>

The first factor to be considered under Section 3142(g) is "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim or a . . . firearm . . . ." 18 U.S.C. § 3142(g)(1). This factor weighs heavily in favor of detention because the defendant committed crimes of violence[2] while acting under color of law. In particular, the defendant brutally and repeatedly raped a minor victim and used his firearm both directly and indirectly to facilitate his sexual assaults.

The defendant abused his position of authority and trust against the most vulnerable members of the community he was sworn to protect: a frightened middle school student who loved her grandmother, and a mother worried about the safety of her children. The defendant did not choose his victims at random; he targeted them because of their vulnerabilities, used those vulnerabilities to manipulate and to threaten them into compliance, and consistently circled back and kept tabs on them to remind them of his power and control over them. The defendant exploited his power and his position to repeatedly and insidiously harm the very people and community he was sworn to protect. He knew how to get away with his crimes year after year after year—by choosing victims

---

[2] All six counts charge the defendant with a violation of 18 U.S.C. § 242 that includes aggravated sexual abuse. Courts look to 18 U.S.C. § 2241 and case law for the definition of "aggravated sexual abuse." Section 2241 defines "aggravated sexual abuse" as the defendant "knowingly caus[ing] another person to engaged in a sexual act- (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping." 18 U.S.C. § 2241(a). Because, by definition, aggravated sexual abuse has an element the use, attempted use, or threatened use of physical force, 18 U.S.C. § 16, it is a crime of violence. *See United States v Muskett*, 970 F.3d 1233, 1238-1241 (10th Cir. 2020) (defining "crime of violence").

he thought he could control, reminding them of his connections and his power, and threatening them into silence.

The defendant's sexual assaults were violent.  He slapped S.K., punched her, and choked her, and would not allow S.K. to move away from him even after he had ejaculated inside of her.  He forced O.W.'s hands above her head and held her in place, undeterred by O.W.'s physical resistance and her telling him in no uncertain terms, "This is rape."  He pushed O.W.'s head onto his penis so hard that she felt like she was choking.

In addition, the defendant's threats were nothing short of horrific.  The defendant did not simply threaten S.K. and O.W. with death if they were to tell anyone what he was doing to them; the defendant also made sure that S.K. and O.W. knew that no one would be able to find their bodies.  The defendant tailored his threats to his minor victim by turning them into a haunting childhood song: "down by the river said a hank a pank, where they won't find her until she stank."  Both victims believed the defendant's threats.  They recognized the power that the defendant wielded in the community and his dangerous connections.

Further demonstrating the danger he poses to the community, the defendant also used his firearm—both directly and indirectly—to commit the sexual assaults.  He struck S.K. with his firearm, threatened to leave S.K.'s brains on the dashboard, and pointed his firearm at S.K.'s feet and told her "bitch I can make you dance."  His firearm was present throughout his sexual assaults of O.W., and both O.W. and S.K. expressed an ever-present fear that the defendant would shoot them.  The defendant possessed a firearm in furtherance of a crime of violence—*i.e.*, willfully depriving S.K. and O.W. of their right to bodily

integrity by committing aggravated sexual abuse and kidnapping. Although the statute of limitations does not allow the government to charge this conduct under 18 U.S.C. § 924(c), the government's evidence would satisfy the elements of that offense. Of course, if the defendant were charged with a Section 924(c) offense, he would be subject to a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). The policy reasons underlying that presumption of detention—the presumption that people who use firearms to commit violent offenses constitute threats to their communities—applies equally in this case: the defendant's repeated use and threatened use of his firearm underscores the danger he poses to the community.

Moreover, considering the nature and circumstances of the offense also requires the Court to weigh the possible penalty the defendant faces upon conviction. *See United States v. Padilla*, No. 09-10130-01-EFM, 2009 WL 4571847 at *3 (D. Kan. Dec. 3, 1999). The sentence the defendant faces if convicted reflects the seriousness of his crimes. The defendant faces life imprisonment on each and every one of the charges, all of which allege the aggravated sexual abuse and attempted aggravated sexual abuse enhancements, and his advisory sentence under the United States Sentencing Guidelines for each of those counts is likewise life imprisonment.

## B. The Weight of the Evidence Against the Defendant

The second factor to be considered under Section 3142(g) is "the weight of the evidence against the [defendant]." 18 U.S.C. § 3142(g)(2). This factor also weighs in favor of detention. In addition to the aforementioned evidence and the ways in which each

victim's account corroborates the other, the evidence shows that the defendant has engaged in a longstanding pattern of using his position as a law enforcement officer to terrorize and traumatize the victims of his sexual assaults, primarily young Black women in vulnerable positions whom the defendant exploited.

Federal Rule of Evidence 413 presumes the admissibility of evidence of prior sexual assaults to be used for any matter "to which it is relevant," including propensity, when a defendant is charged with sexual assault. *United States v. Enjady*, 134 F.3d 1427, 1431 (10th Cir. 1998); *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1268 (9th Cir. 2000) (citing *United States v. Meacham*, 115 F.3d 1488, 1491 (10th Cir. 1997)) ("Fed. R. Evid. 413 . . . was passed to make an exception to Fed. R. Evid. 404(b), which imposed a blanket prohibition on propensity evidence."); *United States v. Guardia*, 135 F.3d 1326, 1330 (10th Cir. 1998) ("[P]ropensity evidence has a unique probative value in sexual assault trials [as] such trials often suffer from a lack of any relevant evidence beyond the testimony of the alleged victim and the defendant."). Federal Rule of Evidence 404(b) "is considered to be an inclusive rule, admitting all evidence of other crimes or acts except [contrary to Rule 413] that which tends to prove *only* criminal disposition." *United States v. Brooks*, 736 F.3d 921, 939 (10th Cir. 2013). Taken together, Rules 413 and 404(b) permit the accounts of other women about the defendant's interactions with and assaults of them. Such evidence, which federal authorities are still investigating, includes—and is not limited to— the following:

### 1. **Other Victim 1**[3]

In the mid-1980s, Other Victim 1 ("OV1") contacted the defendant for assistance with a traffic ticket. OV1 met the defendant at his office; the defendant told her that he would have the ticket dropped and asked her to lunch. During lunch, the defendant made sexually suggestive comments and offered to take OV1 to a motel for sex. When OV1 declined, the defendant offered her money, which she also rejected.

OV1 thought the defendant was going to drive her home, but he drove her to a cemetery instead. OV1 was afraid and began to cry and to pray. The defendant fondled OV1's breasts and demanded oral sex. OV1 said no, and the defendant moved his hand to his hip, where his gun was holstered; OV1 was afraid he was going to use his firearm to kill her.

The defendant ordered OV1 out of the vehicle in the cemetery. OV1 was afraid that if she got out, he was going to kill her there. OV1 would not get out of the vehicle; the defendant drove out of the cemetery and made OV1 get out of the vehicle miles away from her home. He warned OV1 that if she told anyone, he would "get" her, and he told her that "they will believe me before they will ever fucking believe you."

### 2. **Other Victim 2**

In the mid-1980s, Other Victim 2 ("OV2") was walking home with groceries when the defendant drove up and offered to give her a ride home. When OV2 refused, the defendant showed his badge, and OV2 agreed. Instead of driving her home, the defendant

---

[3] Hereinafter, the government will use these "Other Victim" designations in lieu of initials for the Rules 413 and 404(b) victims. A sealed attachment identifies these victims by name for the record.

drove OV2 to a cemetery.  He fondled OV2's breasts.  OV2 attempted to push his hands away and loudly told him "no."  OV2 tried to exit the vehicle, but the door was locked.

The defendant began masturbating and initially had difficulty obtaining an erection. He grabbed OV2 by the back of the neck and roughly forced her head to his penis.  The defendant forced OV2 to perform oral sex on him while keeping his hand firmly on the back of her neck.  OV2 felt pain and felt like she could not breathe.

Afterward, the defendant drove OV2 to her apartment and warned her not to say anything.  OV2 recalled that she immediately outcried to the babysitter she had hired and to her now-deceased boyfriend.  About a week later, the defendant returned to OV2's apartment and tried to convince her to leave with him.  OV2 became distraught, her boyfriend intervened, and the defendant left after a verbal argument.

### 3.  Other Victim 3

Between 1989-1991, when Other Victim 3 ("OV3") was 21 or 22 years old, she got into an argument with her boyfriend and walked to a nearby park.  The defendant drove up, identified himself as police, and told her that she was not allowed to be in the park at that hour.  OV3 could see the defendant's badge and weapon and felt safe getting into his car when he offered to drop her off at home.

Instead of driving her home, the defendant drove to a small field.  The defendant instructed OV3 to get out of the vehicle and told her that she needed to perform oral sex on him.  OV3 froze, and the defendant demanded, "suck my dick."  OV3 was afraid that the defendant was going to physically harm or kill her, particularly given the dark and secluded location.  The defendant grabbed OV3 by the throat and squeezed, pushing her

until she fell into the back seat of his vehicle.  He continued to hold her throat with one hand and attempt to pull at her skirt with the other.  OV3 attempted to push his hand away, and the defendant demanded, "Stop fighting!"  The defendant removed his penis from his pants without taking his pants down, and he continued to wear his gun and badge.  OV3 screamed, "Why are you doing this?"  The defendant responded, "Because I can."  He pulled down her skirt and underwear, put his penis in her vagina, and raped her for approximately two minutes.  OV3 cried and pleaded with the defendant to stop.  The defendant told her to turn over, forced her to her stomach, and began anally raping her with his penis.  OV3 had never had anal sex before and felt significant pain.

Eventually, the defendant stood back up and told OV3 "now suck," gesturing to his penis.  OV3 continued crying and said that she did not want to.  The defendant grabbed the back of her head and forced her to perform oral sex so forcibly that it hurt the back of her throat.  He zipped his pants back up and told OV3 to fix her clothes and get back in the car.  The defendant drove OV3 back to the park.  On the way, he warned her to keep her mouth shut and that she had better not say anything to anyone, because "who would believe you over me?"  Before driving away, the defendant told her, "Remember what I said, keep your mouth closed."

OV3 went to Truman Medical Center, where staff performed a rape kit.  Medical staff called police so that OV3 could make a complaint; terrified, OV3 left the facility before the police arrived.  About two months later, OV3 was walking to a friend's house during the day when the defendant pulled up next to her.  The defendant asked OV3 if she had told anyone, and she said no.  The defendant told her that he knew her brother and that

she needed to continue to keep her mouth shut or something would happen to her or her brother and that he could "put a case" on her brother.

### 4. Other Victim 4

Other Victim 4 ("OV4") met the defendant in 1990 when he was assigned to a criminal investigation of OV4's then-husband. Beginning in the mid-1990s and continuing throughout 2004, the defendant periodically sexually assaulted OV4. On three occasions, the defendant raped her. The defendant threatened to take away OV4's children. OV4 changed her phone number and moved.

In approximately 2016, OV4 saw the defendant again when she was in the hospital. The defendant visited her room, and he told her, "Long time no see." OV4 was terrified and changed hospitals.

### 5. Other Victim 5

In 1990, when Other Victim 5 ("OV5") was approximately 18 years old, the defendant visited her home as part of an investigation. The defendant returned to the home on multiple occasions to speak with OV5, and he took her to Applebees, where he placed his hand on her thigh. The defendant asked OV5 if she'd "ever been with a white guy" and asked her to give him a "creampie" and to "cum on his face." OV5 felt like she had to go out with the defendant because he was a police officer. When the defendant pressured her for sex, he offered to keep her brothers out of trouble and offered to pay her money. After OV5 declined, those close to her began getting into trouble with police.

In 1992 or 1993, the defendant asked OV5 to visit his office at the police station. In his office, the defendant lifted up OV5's dress, held her thighs, and aggressively attempted

to perform oral sex.  OV5 felt like she was trapped and pushed the defendant's head away until he eventually allowed her to leave.

### 6. <u>Other Victim 6</u>

In approximately 2004, the defendant responded to Other Victim 6's ("OV6") home regarding a drive-by shooting.  Days later, the defendant pulled over OV6 when she was on her way to work.  The defendant told OV6 that he knew her sons were involved with criminal activity, and he threatened to arrest OV6 and her sons unless she gave him oral sex or had sex with him.  OV6 refused, and the defendant responded that it was her decision, and if she did not want to, he would take her sons down.  OV6 recalled that she called the KCKPD Internal Affairs Unit to report the incident and was told there was nothing they could do because it was OV6's word against the defendant's.

A few months later, the defendant pulled OV6 over a second time.  He ordered OV6 to follow him to a parking lot.  When OV6 refused, he threatened to write her a ticket, and OV6 told him to write the ticket.  The defendant told her to follow him or she would regret it, and said something about sex, and that he liked "black bitches."  OV6 took off, and the defendant did not follow her.

At the time, OV6 disclosed the incidents to one of her sons, who told her that the defendant had been harassing him and his brother.  About a year after the second incident, one of the brothers was arrested.  The defendant told OV6, "I told you.  I told you I would get him."

OV6 said that she has never had a negative incident with law enforcement, except for the defendant.  OV6 recalled: "When he talked to me like that, and him being in law

enforcement . . . it was really insulting, degrading . . . I was angry but I felt ashamed as well . . . you feel helpless . . . less than a woman or like you're nothing."

### 7. Other Victim 7

In approximately 2004, the defendant called Other Victim 7 ("OV7") after seeing her booking photograph and told OV7 to meet him at the city courthouse, which she did. The defendant then escorted her into an empty office in the building.

The defendant told her that he was a homicide captain and offered to help OV7 by speaking with the prosecutor overseeing her case.  The defendant walked towards OV7, who was sitting down, and began rubbing his genitals through his pants.  With his genitals at OV7's eye level, the defendant told her, "kiss me," which OV7 interpreted as the defendant demanding oral sex.  OV7 jumped up and attempted to leave the office, but the defendant forced the door shut and held it in place, effectively pinning OV7.  The defendant attempted to kiss OV7.  She moved her head side to side to avoid it, and the defendant's nose bumped against her face.  OV7 felt trapped and afraid.

Someone knocked on the door, and the defendant backed away from OV7.  He told OV7 that if she told anyone, she would end up in the morgue, and he would cover it up.

### C. The Defendant's History and Characteristics

The third factor to be considered under Section 3142(g) is "the history and characteristics of the [defendant], including—(A) the [defendant's] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse,

criminal history, and record concerning appearance at court proceedings." 18 U.S.C. § 3142(g)(3)(A). This factor also weighs in favor of detention.

That the defendant was a law enforcement officer and has no criminal history heightens, rather than mitigates, the seriousness of his crimes and the danger he poses to the community. *See United States v. LaVallee*, 439 F.3d 670, 708 (10th Cir. 2006) ("[I]n many instances, committing a crime while acting under color of law will result in a higher sentence – as it did in this case – rather than a lower sentence."); *United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) ("A defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by a police officer constitutes an abuse of a public position."); USSG § 2H1.1(b)(1) (instructing that a six-level increase of offense level applies where a defendant was acting under color of law). The defendant spent his years on the force violating the constitutional rights of girls and women by sexually abusing and terrorizing them. The defendant was able to get away with his crimes for so long in part because he repeatedly reminded his victims that he had the power to ignore the law and to ensure that harm and death came to them. The defendant's history and characteristics demonstrate that there are no conditions to reasonably assure the safety of the victims and the community.

The defendant is *more* dangerous—not less—today. Though the defendant's charged crimes occurred decades ago, he has demonstrated a continued pattern of engaging in predatory behavior and implicit and explicit threats. For example, more than 20 years after his initial assault of OV4, he appeared in her hospital room, terrifying her and prompting her to transfer to a different hospital. The defendant is now charged and facing

life in prison, and the investigation has revealed the defendant's ability to keep "tabs" on and to threaten his victims; his connections to organized crime and criminals; and his facility with manipulating those connections to gain benefits for himself.  Though the crux of the government's argument is the defendant's dangerousness, the government notes that these factors—the potential sentence of life imprisonment faced by the defendant and the defendant's connections—apply both to dangerousness and to risk of flight or failure to appear and weigh heavily in favor of detention.

The government acknowledges that the defendant has serious medical conditions. It is the government's understanding that the defendant's medical needs can be accommodated in a detention facility, and that pretrial detainees in other matters have received dialysis, insulin treatment, and any of the other medical treatment required by the defendant.  The defendant's history and characteristics weigh heavily in favor of his pretrial detention, and the balance is not offset by the defendant's medical condition because his medical needs can be accommodated in detention.

### D. <u>The Nature and Seriousness of the Danger to Any Person or the Community</u>

The final factor to be considered under Section 3142(g) is "the nature and seriousness of the danger to any person or the community that would be posed by [the defendant's] release."  18 U.S.C. § 3142(g)(4).  Analysis of this factor shows that the defendant's pretrial detention is necessary.  Clear and convincing evidence establishes that no condition or combination of conditions will reasonably assure the safety of other people or the community.

The defendant's victims live in fear because he has used his position of power to terrorize and traumatize them.  As of the date of this filing, September 16, 2022, the government has heard from some of the defendant's victims through counsel, who informed government counsel that the day the defendant was taken into custody "was the first day that any of them have felt any degree of safety in the last three decades."  Counsel informed the government that the victims will feel threatened by the defendant's release, and that it is difficult for them to imagine a more dangerous person than the defendant.

As set out above, the pattern of evidence establishing the defendant's threats and his dangerousness is overwhelming.  In an analogous case, *United States v. Ruiz*, No. 4:20-cr-582-1, 2021 WL 1427804, at *4-5 (S.D. Tex. Apr. 15, 2021), the defendant was indicted for violating 18 U.S.C. §§ 242 and 924(c)(1)(A) by sexually assaulting two women while acting under color of law and for possessing a firearm in connection with both crimes of violence.  In ordering detention, the court explained:

> True, Ruiz didn't commit any violent acts during the year that he was released on bond following the state charges.  But given the nature of the alleged underlying conduct, the danger posed to the victims and to the community by any subsequent similar act is severe.  And it simply can't be ignored that Ruiz allegedly committed these offenses while in the line of duty as a police officer.  The charges themselves address facts that Ruiz has demonstrated the intent and ability to conceal and obstruct revelation of his conduct.  Likewise, to commit these types of acts—and again, for purposes here, the weight of the evidence is strongly against him—he had to disregard and overcome specific legal training in addition to the usual moral and legal constraints against such conduct.  It can't be assumed that his future good behavior is in any way assured.  The Government has met its burden to show by clear and convincing evidence that no condition or set of conditions of release would guarantee the community's safety.

*Id.* at *4-5.  In another analogous case, *United States v. Mitchell*, 1:22-mj-3273-MD, Dkt. No. 12 (S.D. Fl. Aug. 3, 2022), the defendant-officer was indicted for violating 18 U.S.C. § 1201 by kidnapping a minor victim and sexually assaulting her.  In ordering detention, the court concluded that, although "there are adequate conditions available to ensure [the defendant's] appearance," "there is not enough to provide a reasonable assurance of safety to the community." *Id.* at 3-4.  In particular, the court reasoned: "Defendant's argument that he has complied thus far with the conditions of his state bond [and] therefore he should receive a federal bond is, frankly, unavailing.  Moreover, Defendant's lack of criminal history is similarly unpersuasive," due in part to the "Defendant's background, training, and placement in a position of public trust." *Id.*  The court concluded that "there are not any conditions or combination of conditions that would reasonably assure the safety of the community as required by statute." *Id.* at 4.

Here, the defendant's dangerousness is further heightened because he is facing a potential sentence of life in prison for his crimes.  As in *Ruiz*, the defendant "has demonstrated the intent and ability to conceal and obstruct revelation of his conduct," and "[i]t can't be assumed that his future good behavior is in any way assured."  2021 WL 1427804 at *4.  Before the defendant was ever charged with an offense carrying a potential sentence of life imprisonment—indeed, before charges were even on the horizon for the defendant—the defendant threatened to kill a grandmother, to put a victim in the morgue, and to kill victims or have victims killed and to ensure that their bodies were never found, if his victims reported him.  The defendant approached one of his victims more than 20 years after he first sexually assaulted her to communicate that he still remembered her and

23

knew where she was.  No condition or combination of conditions will reasonably assure the safety of other people or the community because adherence to any conditions would require a respect for and obedience to the law, and this defendant has shown nothing but utter contempt for the law.  He has spent decades lording his power over his victims and the community by demonstrating how unbound by legal limits he feels.  The only way to assure community safety is detention.

## IV.   <u>**CONCLUSION**</u>

Based upon the nature and circumstances of the offense, the weight of the evidence against the defendant, the defendant's history and characteristics, and the nature and seriousness of the danger to others and the community, the government respectfully moves this Court to order that the defendant be detained pending trial because there is no condition or combination of conditions that will reasonably assure the safety of other people or the community if he were released.


Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

By: */s/ Tara Allison*
Tara Allison
Trial Attorney, Criminal Section, Civil Rights Division
United States Department of Justice
150 M St. NE, Suite 7.1132
Washington, DC 20002
Ph: (202) 598-7882
Email: tara.allison@usdoj.gov
NY Bar No. 5666029

DUSTON J. SLINKARD
UNITED STATES ATTORNEY

By: /s/ *Stephen A. Hunting*
Stephen A. Hunting
Assistant United States Attorney
District of Kansas
444 Quincy St., Suite 290
Topeka, Kansas 66683
Ph: (785) 295-2850
Fax: (785) 295-2853
Email: stephen.hunting@usdoj.gov
Ks. S. Ct. No. 21648